Slip Op. 11 - 133

## UNITED STATES COURT OF INTERNATIONAL TRADE

```
- - - - - - - - - - - - - - - - - - x
FIRSTRAX, DIV. OF UNITED PET GROUP,
INC.,                               :
                    Plaintiff,
                                    :
              v.                         Court No. 07-00097
                                    :
UNITED STATES,
                                    :
                    Defendant.
- - - - - - - - - - - - - - - - - - x
```

Opinion

[Upon cross-motions as to classification
of *port-a-crates,* summary judgment for
the plaintiff.]

Decided: October 21, 2011

Barnes Richardson & Colburn (Lawrence M. Friedman and Shama K. Patari) for the plaintiff.

Tony West, Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jason M. Kenner); and Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection (Beth Brotman), of counsel, for the defendant.

AQUILINO, Senior Judge:   This test case contests classification by U.S. Customs and Border Protection ("CBP") of merchandise imported from China for the plaintiff *sub nom. port-a-crate*® under copious heading 4202 of the 2005 Harmonized Tariff Schedule of the United States ("HTSUS"), to wit,

> Trunks, suitcases, vanity cases, attache cases, briefcases, school satchels, spectacle cases, binocular cases, camera cases, musical instrument cases, gun cases, holsters and similar containers; traveling bags, insulated food or beverage bags, toiletry bags, knapsacks and backpacks, handbags, shopping bags, wallets, purses, map cases, cigarette cases, tobacco pouches, tool bags, sports bags, bottle cases, jewelry boxes, powder cases, cutlery cases and similar containers, of leather or of composition leather, of sheeting of plastics, of textile materials, of vulcanized fiber or of paperboard, or wholly or mainly covered with such materials or with paper[,]

in particular, subheading 4202.92.9026 ("Other . . . With outer surface of sheeting of plastic or of textile materials . . . Other . . . Other . . . Other: Of man-made fibers . . . 17.6%). The importer duly protested that the goods should have been classified as other made up (textile) articles within the meaning of HTSUS subheading 6307.90.9889.

Upon CBP denial of the protest and liquidation of the duties claimed, the plaintiff filed its complaint herein that has been answered by the defendant, which thereafter interposed a motion for summary judgment upon the joined issue(s). Plaintiff's simultaneously-filed response is in the form of a cross-motion for summary judgment.

I

The court's jurisdiction is pursuant to 28 U.S.C. §§ 1581(a) and 2631(a), and its Rule 56(h)(1) requires that any motion for summary judgment contain a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried.

Defendant's motion contains such a statement, in part, as follows:

1.   The imported merchandise consists of 12 models of soft crates.

2.   Soft crates are a subset of the pet containment category of pet products.

3.   The pet containment line of products also includes plastic crates and wire kennels.

4.   Each of the 12 models of soft crates is comprised of a metal skeleton covered by a textile skin.

5.   The soft crates are portable products designed to transport a docile or crate-trained pet in the back of a sport utility vehicle ("SUV").

6.   The soft crates at issue are products designed to contain docile or crate-trained pets in the home, at a friend's home, at the park, on camping trips, etc.

7.   The soft crates at issue vary in size based on the size of animal they are designed to contain.

8. The soft crates at issue range in size from those used to contain and transport 10 pound pets to those used to contain and transport 70 pound pets.

9. All models of the soft crates at issue are designed to protect a docile or crate-trained pet in the car by keeping them contained in the back of the vehicle, and preventing them from impeding the driver.

10. All models of the soft crates at issue protect docile or crate-trained pets from the sun when used out[]doors.

11. All models of the soft crate at issue offer docile or crate trained pets protection from running away and/or getting lost when used at the park, camping, or anywhere outdoors.

12. All models of the soft crates at issue are designed to be portable.

13. All models of the soft crates at issue are designed to prevent unwanted behavior such as jumping on visitors by confining the pets.

14. The soft crates at issue are designed to contain a docile or crate-trained pet for reasonable lengths of time.

15. The soft crates at issue are designed to contain a docile or crate-trained pet in the home, thus preventing the pet from damaging furnishings in the home.

16. The soft crates are designed to contain trained pets until such time as their owners let them out.

17. The soft crates at issue offer certain levels of protection for pets placed inside of them.

18. Soft crates are a product designed to contain docile pets.

19. All models of the soft crate at issue are designed to keep docile or crate-trained pets in their proper place both in and out of the home, including during transport in an SUV.

The defendant proffers support for each of these representations, the citations to which have been omitted in the interest of brevity.

Plaintiff's written response to the foregoing admits 1, 2, 3, 4, 7, 10, 12, 13, and 17. Its crafted reply to the other averments is:

5. Denies. Plaintiff avers that the soft crates have no design features or characteristics making them suitable for transporting pets.

6. Denies that soft crates are products only designed to contain docile or crate-trained pets in the home, at a friend's home, at the park, or on camping trips. Admits that soft crates provide a den-like home for dogs in those settings.

8. Denies that soft crates transport or contain pets while they are housed and in use. Admits that soft crates range in size from those used to house 10 pound pets to those used to house 70 pound pets. . . . Plaintiff avers that the pound measurement is irrelevant and intended only as an approximation of physical size.

9. Denies that soft crates were designed to protect pets by keeping them contained in the back of a vehicle. Admits that soft crates may occasionally be used to provide home environments for pets and to prevent crate-trained pets from distracting the driver of a motor vehicle.

    11.  Denies.  Plaintiff avers that the level of
protection provided by soft crates is not meaningful.

    14.  Denies.  Plaintiff avers that the soft crates
are designed to house pets for a reasonable length of
time.

    15.  Denies.  Plaintiff avers that the soft crates
provide an indoor home environment for the docile or
crate-trained dogs.   . . . Because dogs cannot be
permanently contained, the soft crates do not protect
home furnishings.

    16.  Denies that soft crates are designed to
contain trained pets until such time as their owners
let them out.  Admits that soft crates are designed to
house pets for as long as they like to be housed.

    18.  Denies.  Plaintiff avers that the soft crates
are de[s]igned to house docile pets.

    19.  Denies that soft crates have any design
features adapting them to use in any vehicle. . . .
Denies that the soft crates are designed to keep docile
pets in their proper place at home or during transport
in an SUV.  Admits that soft crates are designed to
provide den-like homes for pets both in and out of the
home.

Citations omitted.


        In  support  of  its  own  cross-motion  for  summary

judgment, the plaintiff has filed a Rule 56(h) Statement of

Material Facts to Which No Genuine Dispute Exists, which the

defendant correctly points out is not in keeping with the letter

or the spirit of the rule, given its 21 pages and 178 individual

averments.  To sift out some of them:

10.   Soft crates were created to fill a need in the pet industry for soft-sided temporary pet homes.

11.   Based on its own market research in 2001, Firstrax determined that there was a need for a hospitable and aesthetic alternative to rigid wire crates or plastic carriers.

12.   The marketing target of Firstrax was to create a niche market for docile or crate-trained pets, in particular dogs, to have a soft-sided crate that provides a "den" or "cave-like" environment.

13.   The soft crates were designed to have furniture and a home decor aesthetic, rather than a harsh wire or molded plastic aesthetic.

20.   The soft crates are constructed of nylon fabric stretched over a cube made of tubular steel.

21.   The steel structure consists of a top and bottom rectangular tube structure connected at each of the four corners by four vertical poles.

22.   The steel structure is designed to be collapsed or set up in one movement, without the use of tools.

23.   The initial design innovation involved creating a slide and snap locking mechanism on the tubular structure for easy set up, which also folds flat for easy movement and storage.

24.   The tubular structure supports only the edges of the cube: the top, sides and bottom of the soft crates consist solely of nylon fabric.

25.   The sides and doors of the crates have mesh windows.

26.   The doors and entry points have a zip closure that is designed to be rolled up and secured with a strap to allow the door to remain open if desired.

28. During the production process, the strength of the inner steel tubular structure was tested informally by having a 100-pound employee stand on the steel structure only.

29. The main concern of the testing was to see if the steel tubular structure would warp under too much weight, resulting in the inability for the mounting mechanism to function properly.

30. There were no tests conducted regarding the weight that the crate would carry, as this was not the intended purpose of the soft crates.

36. Soft crates are designed to rest on a solid surface, such as the floor or ground, which provides the needed support so that the weight of the pet does not cause the bottom of the crate to buckle or tear.

37. The strength of the bottom and side panels was not tested during the design or production stage because the bottom panel was never designed to resist or carry weight.

38. Some models of the soft crates have fabric tabs with grommets to allow the crates to be staked into the ground for outdoor use.

39. The soft crates were initially designed to be a portable area for pets, similar to playpens, which are designed to provide a comfortable environment for children either in their own homes or at travel destinations, but not to carry or transport children.

42. For the smaller models, handles were placed on the top of the models to aid in moving the empty soft crates from place to place without having to collapse it.

43. The smaller models were not designed to be moved with the pets inside them because there is no rigid bottom on the soft crate to support the pet during transport.

44. None of the soft crate models were [*sic*] tested to see if they could accommodate the weight listed, because they were not designed to be weight-bearing crates.

45. The soft crates were designed to be stationary homes.

46. For larger models, handles were placed along the bottom of the side panel, so the empty crate could be folded flat and carried from place to place when collapsed, much like an architect's portfolio.

52. The soft crates were not designed to duplicate the function of pet carriers, because of the lack of rigid bottom and awkwardness in carrying.

74. The soft crates are used by the pet to allow it to take a break and to provide the pet with [a] preferred place to sleep at night.

86. The soft crates, if properly used, . . . are portable pet homes for dogs that have been trained to accept them as their den or home.

93. Soft crates can not replace a [wire or plastic] kennel if the intent of the pet owner is to securely contain a dog or animal.

98. The fabric used for the soft crates is not waterproof, nor is it insulated.

99. The top and sides of the soft crates do not have the capacity of protecting a pet inside from cold, rain or snow.

100. If they are used outside, they are appropriate for use in late spring and summer in most climates.

108. The soft crate does not provide the security normally associated with wire kennels or plastic crates.

111. In contrast to the wire crates and plastic carriers that already existed in the market, the soft crates were designed to have rounded corners so that they would fit in the home environment without damaging floors or car seats when the empty crate was being moved about.

117. . . . [T]he fabric shell and mesh windows can be torn by any pet improperly confined in a soft crate.

118. Improper confinement means using the soft crate as a kennel and not as a pet home.

121. In contrast to rigid plastic, wood, or metal kennels that were designed for the secure containment of pets, the zipper and latch of a soft crate will not prevent a dog from easily escaping a soft crate by ripping through the fabric.

122. Soft crates were not designed with structural or weight bearing requirements that would enable the soft crates to be used for the purpose of transporting pets.

123. The soft crates do not meet the IATA airline transport safety standards for either domestic or international flight.

125. Soft [c]rates are not small enough to fit under the seat; they are not sturdy enough for cargo area.

127. The purpose of pet carriers is to safely and securely transport an animal.

128. Pet carriers are usually constructed of "high impact molded plastic."

129. Pet [c]arriers have 1) the structural integrity to withstand transit while protecting the animal inside; 2) secure locking mechanisms to prevent escape; 3) rigid floor construction that allows the animal to stand when the carrier is either carried, or placed on an uneven surface; and 4) non-absorbent, leak

proof floor material that will contain small amounts of urine to protect surfaces the carrier is place[d] on[.]

135. For soft crates, water and urine spills will soak into the bottom, making it unsuitable for the transport or containment of pets over any extended period of time.

136. Any carrier intended by design as suitable for airline use must comply with U.S. domestic and IATA international standards for both cargo and in-cabin transport.

140. Carriers and kennels must have a rigid bottom and a stable base that is integral to the unit, which, unlike the soft crates, do not rely on the ground or floor to support the animal inside.

141. Pet carriers or kennels used for the transport of pets constructed of steel wire or rigid plastic are strong enough to reasonably prevent even untrained pets from escaping.

143. In the event that a soft crate is used in a motor vehicle, the crate should be first put in the vehicle, and the pet then placed in the crate.

144. The purpose of using a soft crate in a motor vehicle is to provide the pet with a comfortable home environment rather than to provide the pet safe and secure transport.

145. . . . [T]he design features of the soft crate are not intended to make them a safe means of transporting pets in a moving motor vehicle.

148. Soft crates do not have loops incorporated into their structure that would allow the crates to be strapped in using seat belts.

149. Use in a motor vehicle is strictly for docile, crate-trained dogs to provide a safe and anxiety free environment for a traveling pet.

155. In contrast to the soft crates, pet carriers designed for use in motor vehicles include features such as tie-down strap holes molded into the rigid plastic of the carrier body, or have molded clips which can secure the pet carrier with a seat belt or other tie down strap.

156. Pet carriers are sized to limit the pet's ability to move around while . . . inside . . . so that the pet is encouraged to lie down.

157. The lack of extra space helps to protect the pet during a sudden severe driving maneuver or crash.

158. Neither the steel frame nor the soft crate nylon cloth exterior were designed to withstand impacts likely to "result from a vehicle crash, sever[e] maneuver, or from other stationary or loose objects in a vehicle that could damage the soft crate and the pet inside under crash conditions."

163. The locking system of the tubular structure could collapse if a pet were put inside the soft crate and the crate would be lifted or carried.

164. In addition, the non-rigid fabric bottom would stretch with the weight of the pet inside when lifted up, with the potential for the pet to eventually fall through the bottom panel.

165. For the smaller sized crates, the unsupported bottom panel would sag under the weight of the pet, causing the pet to be uncomfortable.

166. The lack of a rigid bottom panel on the soft crates makes them unsuitable for transporting pets inside them.

167. Although some of the smaller sizes originally had shoulder straps, it was determined that it was impractical to carry the crate in this manner, because its steel structure makes the carrier shift weight and lean over the crate to compensate for the awkward angle of the crate hanging from a shoulder strap.

168. The handles incorporated onto the top of the smaller crates were intended to allow consumers the option of moving the soft crate around without the pet inside, without having to collapse the crate and reassemble it at the destination.

169. There are no handles incorporated onto the larger crates, because of the impracticality of moving a large soft crate without first collapsing it.

170. The soft crates do not provide any pockets for interior organization of the pets or their accessories, because they are designed to provide an enclosed space to house a pet.

171. The soft crates are not designed to hold toys, cushions, or blankets. These items may be placed inside the crates, but they would have to be removed when the crate is folded for transport, because the crates fold completely flat.

172. The soft crates of the type at issue in this case are not intended to serve as an organizer of pet toys, treats, bedding, etc.

173. Dogs can and do escape from soft crates.

174. It is not recommended, or even feasible in some cases, to leave a pet inside a soft crate for an extended period of time.

175. Dogs would only stay in a soft crate for time periods that are reasonable based on the training that the dog has had.

176. The length of time a pet could stay in a soft crate would depend on factors such as the time duration used during training, the health and age of the pet, and . . . feeding and watering requirements.

Citations omitted.

Defendant's even-lengthier Response to Plaintiff's Separate Statement of Undisputed Facts admits outright or in sum and substance plaintiff's foregoing paragraphs 13, 20, 21, 25, 26, 30, 38, 42, 43, 44, 46, 98, 100, 111, 123, 127, 136, 143, 145, 148, 149, 179, 171, 175, and 176.   It either denies or pleads lack of information sufficient to answer all of the other averments of the plaintiff quoted above.

II

Whatever the precise disagreements between the parties regarding the facts herein, their cross-motions for summary judgment are clearly well-founded.   That is, the court concludes after consideration of the foregoing statements that there is no genuine issue of material fact that requires trial within the meaning of USCIT Rule 56 and teaching of <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), and <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), and their progeny.   The dispute is simply a matter of law, to wit, interpretation of provisions of the HTSUS.

Plaintiff's merchandise at bar is not found therein *eo nomine*, whereupon CBP defends its classification under heading 4202 via *ejusdem generis*.   In <u>Avenues in Leather, Inc. v. United</u>

<u>States</u>, 423 F.3d 1326 (Fed.Cir. 2005), the court pointed out in

another classification case focusing on the very same heading

that

> *ejusdem generis* requires that, for any imported
> merchandise to fall with [its] scope . . ., the
> merchandise must possess the same essential
> characteristics or purposes that unite the listed
> exemplars . . . .

423 F.3d at 1332, citing <u>Sports Graphics, Inc. v. United States</u>,

24 F.3d 1390, 1392 (Fed.Cir. 1994).

> However, a classification under the *ejusdem
> generis* principle "is inappropriate when an imported
> article has a specific and primary purpose that is
> inconsistent with that of the listed exemplars in a
> particular heading."

<u>Id.</u>, quoting <u>Avenues in Leather, Inc. v. United States</u>, 178 F.3d

1241, 1244 (Fed.Cir. 1999).  And the court of appeals proceeded

to point out that it had previously held that

> "the common characteristic or unifying purpose of the
> goods in heading 4202 consist[s] of 'organizing,
> storing, protecting, and carrying various items.'"

<u>Id.</u>, quoting <u>Avenues in Leather, Inc. v. United States</u>, 317 F.3d

1399, 1402 (Fed.Cir. 2003).

Following this approach does not lead this court to

conclude that plaintiff's *port-a-crates* land within the ambit of

HTSUS heading 4202.

A

To quote the paragon American lexicon, to "organize" is to "arrange or constitute in interdependent parts, each having a special function, act, office or relation with respect to the whole". Webster's New International Dictionary of the English Language, Unabridged, p. 1719 (2d ed. 1934). Defined another way, organize means "to bring together or form as a whole or combination, as for a common objective." Funk & Wagnalls Standard Dictionary of the English Language, p. 890 (int'l ed. 1963).

In the context of heading 4202, organization implies multiple items placed together in a single container. See, e.g., Totes, Inc. v. United States, 18 CIT 919, 865 F.Supp. 867 (1994) (automotive tools and supplies in tool cases), aff'd, 69 F.3d 495 (Fed.Cir. 1995); Len-Ron Mfg. Co. v. United States, 24 CIT 948, 118 F.Supp.2d 1266 (2000) (multiple cosmetics in cases therefor), aff'd, 334 F.3d 1304 (Fed.Cir. 2003); Processed Plastic Co. v. United States, 29 CIT 1129, 395 F.Supp.2d 1296 (2005)(children's toys in children's backpacks), aff'd, 473 F.3d 1164 (Fed.Cir. 2006).

The plaintiff is correct in pointing out that named exemplars of heading 4202 are specifically designed to organize a

number of items.  Here, each *port-a-crate* is intended for only

one pet.  None is designed for more than a single animal.  Unlike

toiletry   bags,   for   example,   which   often   have   multiple

subcompartments, the crates are "soft-sided temporary doghouses"

"developed with only one compartment and intended to house only a

dog".   Indeed,  it  is  doubtful  that  anxious  dogs  (or  cats)  are

capable   of   "organization"[1]   in   such   goods,   unlike   the   way

toiletries or pairs of socks or pieces of jewelry or of cutlery

*et cetera* are.

B

To "store" is to keep or set aside for future use. <u>See</u>,

<u>e.g.</u>, Webster's Third New International Dictionary, Unabridged,

p. 2252 (1981).  Defendant's preferred definition is:

> 3.   To place or leave in a location (as a warehouse,
> library,  or  computer  memory)  for  preservation  or  use
> later.  As such a particular item's ability to hold or
> contain something.

Defendant's  Memorandum,  p.  10,  citing  Merriam-Webster  Online

Dictionary,  <u>http://merriam-webster.com/dictionary/store</u>  (2009).

---

[1] The  court  understands  that  "simply  'containing'  items  is
at least a rudimentary form of 'organization'". <u>Processed Plastic
Co.  v.  United  States</u>,  29  CIT  1129,  1142,  395  F.Supp.2d  1296,  1309
(2005).  However,  the  test  for  classification  is  whether  the
organizational  ability  is  an  essential  characteristic  of  the
subject  merchandise.   <u>See</u>,  <u>e.g.</u>,  <u>Totes,  Inc.  v.  United  States</u>,  18
CIT  919,  924,  865  F.Supp.  867,  872  (1994).   The  court  cannot  so
find here.

While containing and storing things are similar, they are not

equivalent.  Contain is defined as:

> 1: To keep within limits: hold back or hold down: as
>     a:   RESTRAIN, CONTROL . . . SUPPRESS . . .
>     b:   CHECK, HALT, WITHSTAND, STEM . . .
>     c:   to confine (the enemy) to the immediate terrain
>          or to a limited area: prevent (the enemy) from
>          making a breakthrough . . ..

Webster's Third New International Dictionary, Unabridged, pp.

490-91 (1981)(capitalization in original).  Whereas to "store" is

to put items and other inanimate objects aside for the future,

to "contain" can be to restrain or suppress animated things from

acting a certain way.

        In this case, the plaintiff argues, and the court

concurs, that, as a practical matter,

> soft crates do not have the ability to store dogs away
> for later use at the convenience of the owner.  First,
> the dogs must be trained to accept the soft crate as
> its[*sic*] home. . . . Second, the soft crates provide no
> means of supplying food or water to dogs, nor do they
> have a mechanism for dealing with urine or solid waste.
> Therefore, any "containment" function is only
> incidental to the dog['s] coming and going of its own
> volition.

Plaintiff's Response to Defendant's Motion, p. 7 (citations

omitted).  The plaintiff, noting defendant's attempt to equate

living, breathing dogs with inanimate objects like tools or beach

toys, states further:

> . . . Dogs are pets. They are members of the family,
> working partners, assistants to the disabled, and
> valuable show dogs. Treating the[m] as items to be
> stored for later retrieval and use invokes images of
> the kind of cruel containment devices the soft crate
> was designed to replace in the home environment. A
> more apt comparison is to children who may be placed in
> a corner or play pen, but would not be described as
> "stored" or "contained."

Id. at 7.

On their face, exemplars listed in heading 4202 store

and/or contain inanimate objects of personal property, not

living, breathing animals. They include, inter alia, tobacco

pouches, suitcases, handbags, wallets, toiletry bags, jewelry

boxes, purses, cigarette cases, cutlery cases, musical-instrument

cases, camera cases, school satchels, and gun cases. See

generally Totes, Inc. v. United States, supra.

Port-a-crates on the other hand are not designed to

store living four-legged pets. They are made of soft, permeable

materials of mesh and nylon, capable of being worn or torn

through. Whatever the precise structural integrity of the

crates, they are not meant to warehouse their animate visitors.

Unlike pet carriers made of rigid materials, such as hard

plastic, metal or wood, the soft crates do not comply with either
U.S. domestic or IATA international standards for either cargo or
in-cabin airline transport.

Rather, a pet could, "if it chooses, chew and tear
through the crate at any time. . . . The crate is only meant to
act as a home for a dog and is purposely not made to cage or
contain a dog." Plaintiff's Response to Defendant's Motion, p. 4
(citations omitted).

C

Nor do the *port-a-crates* provide any significant
protection, the third essential characteristic of the heading
4202 exemplars. As set forth above, they are made of nylon and
mesh that are permeable to aggressive animal fangs and claws and
capable of being torn through. They do not provide much
protection from weather elements, as they are not waterproof and
do not prevent leakage. They are not airline safe; nor would
they protect a pet from being crushed in an automobile collision.
Rather, the *port-a-crates* are meant to be used in a home or other
stable setting to provide a den-like refuge for their occupants.
Any protection from the sun or minor impacts would be incidental,
and not their essential purpose.

D

The last defining characteristic of the heading 4202 exemplars is their ability to carry their intended contents, which they will organize, store, and protect. See, e.g., Totes, Inc. v. United States and Processed Plastic Co. v. United States, supra.  Here, the *port-a-crates'* structure and nylon materials prove they are not meant to hold and transport animals safely. They

> are not designed or tested to withstand the weight of a
> dog when carried.  The crates are designed to stand on
> a solid surface such as a floor.  Carrying the crate
> while  the  dog  is  housed  inside  is  not  only
> uncomfortable, . . . it is unsafe for the dog. . . .
> The crate bottoms are not reinforced or rigid and can
> buckle under the weight of the dog. . . .

Plaintiff's Response to Defendant's Motion, p. 11 (citations omitted).

While the defendant correctly notes that "[t]here is no weight or structural integrity requirement specified for heading 4202[]"[2], the crates' design and structure make them incapable of desirable conveyance of their living contents.  Hence, the court cannot find that plaintiff's *port-a-crates* are pet carriers.

---

[2] Defendant's Memorandum, p. 15, citing Processed Plastic Co. v. United States, 473 F.3d 1164, 1171 (Fed.Cir. 2006).

### III

In view of the foregoing, defendant's motion for summary judgment cannot be granted.  As for plaintiff's cross-motion, at first blush, classification of the *port-a-crates* as posited under HTSUS chapter 63 (Other Made Up Textile Articles ...) might seem anomalous, but the memorandum of law in support thereof persuades this court that the motion should be granted due to lack of an HTSUS subheading more correct than the basket provided by 6307.90.9889.

Judgment will enter accordingly.

Decided: New York, New York

October 21, 2011

/s/ Thomas J. Aquilino, Jr.
Senior Judge

J̲ U̲ D̲ G̲ M̲ E̲ N̲ T̲

UNITED STATES COURT OF INTERNATIONAL TRADE

Thomas J. Aquilino, Jr., Senior Judge

- - - - - - - - - - - - - - - - - x
FIRSTRAX, DIV. OF UNITED PET GROUP,
INC.,                                     :
                      Plaintiff,
                                          :
           v.                                   Court No. 07-00097
                                          :
UNITED STATES,
                                          :
                      Defendant.
- - - - - - - - - - - - - - - - - x

This test case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein;  Now therefore, in conformity with said decision, it is

ORDERED, ADJUDGED and DECREED that defendant's motion for summary judgment be, and it hereby is, denied; and it is further

ORDERED, ADJUDGED and DECREED that plaintiff's cross-motion for summary judgment be, and it hereby is, granted; and it is further hereby

ORDERED, ADJUDGED and DECREED that the merchandise that underlies this test case is correctly classifiable under subheading 6307.90.9889 of the 2005 Harmonized Tariff Schedule of the United States; and it is further hereby

ORDERED that Customs and Border Protection, United States Department of Homeland Security, reliquidate any entries of said merchandise that have not been liquidated under the aforesaid HTSUS subheading and refund to the plaintiff any excess duties paid, together with interest thereon as provided by law.

Dated:  New York, New York
        October 21, 2011


                            /s/ Thomas J. Aquilino, Jr.
                               Senior Judge